SLR:LDM:KKO
F. #2018V01388

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   MAY 2 3 2018   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,

               Plaintiff,

       – against –

THE REAL PROPERTY AND PREMISES
LOCATED AT 8 HALE DRIVE,
HALFMOON, NEW YORK 12065; AND

THE REAL PROPERTY AND PREMISES
LOCATED AT 127 GRENADIER
COURT, HALFMOON, NEW YORK
12065,

         Defendants *in rem*.

– – – – – – – – – – – – – – – – – X

**VERIFIED
COMPLAINT** *IN REM*

Civil Action No.

**CV18 – 3041**

**JOHNSON, J.**

**GOLD, M.J.**

Plaintiff, United States of America, by its attorney, Richard P. Donoghue,

United States Attorney for the Eastern District of New York, Karin Orenstein, Assistant United

States Attorney, of counsel, alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is a civil action *in rem* brought by the United States of America to

forfeit and condemn to the use and benefit of the United States (a) the real property and

premises located at 8 Hale Drive, Halfmoon New York 12065, together with its respective

buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings (the

"Hale Drive Property"), and (b) the real property and premises located at 127 Grenadier Court,

Halfmoon, New York 12065, also known as Unit No. 127 of Building No. 7 of the Grenadier Court Condominium, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements, and furnishings, and appurtenant undivided interest in the Common Elements of the Grenadier Court Condominium (the "Grenadier Court Property", and collectively, the "Defendants *in rem*").  Plaintiff seeks the forfeiture of the Defendants *in rem* in accordance with 18 U.S.C. § 1594(e)(1)(A), as property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 1591 (sex trafficking) and/or conspiracy to commit a violation of § 1591, contrary to 18 U.S.C. § 1594.

## THE DEFENDANTS *IN REM*

2.     The Hale Drive Property is a two-story residence in Halfmoon, New York.  It was purchased in 2004 by Executive Housing & Properties, Inc.  According to a search of the New York State Department of State corporation database, an entity with this name was registered in New York on January 9, 2004.  A search of the State of Delaware Department of State corporation database shows that an entity with the same name was registered in Delaware on January 28, 2004.  Nancy Salzman was the chief executive officer of the New York entity, which was dissolved in 2009.

3.     The Grenadier Court Property is part of the Grenadier Court Condominium located in Halfmoon, New York.  It was purchased in 2014 by 224 Grenadier Court, LLC, which has a mailing address in Albany, New York.  No registered agent or corporate officer is listed for this entity in the New York States Department of State corporation database.

2

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.     Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395 in that acts and omissions giving rise to the forfeiture occurred in the Eastern District of New York.

## STATUTORY FRAMEWORK

6.     Title 18, United States Code, Section 1591(a)(1) provides in relevant part that "[w]hoever knowingly . . . in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . . knowing . . . that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . ."

7.     Title 18, United States Code, Section 1591(e)(2) defines "coercion" as:

(A)     threats of serious harm to or physical restraint against any person;

(B)     any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C)     the abuse or threatened abuse of law or the legal process.

8.     Title 18, United States Code, Section 1591(e)(4) defines "serious harm" as:

any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to

3

compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

9.      Title 18, United States Code, Section 1591(e)(3) defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

10.     Title 18, United States Code, Section 1594(e)(1)(A) provides in relevant part that "[a]ny property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of [Section 1591, *inter alia*], and any property traceable to such property" shall be subject to forfeiture to the United States.

11.     Title 18, United States Code, Section 1594(e)(2) provides that the provisions of Title 18, United States Code, Section 981, *et seq.*, relating to civil forfeitures shall extend to any seizure or civil forfeiture under Section 1594(e).

## FACTUAL BACKGROUND

I.      Nxivm

12.     In or about 1998, Keith Raniere and Nancy Salzman co-founded Executive Success Programs, Inc. ("ESP"), a series of workshops designed, according to its promotional literature, to "actualize human potential."  In or about 2003, Raniere founded an organization called Nxivm (pronounced NEX-i-um), which served as an umbrella organization for ESP and other Raniere-affiliated entities.

13.     Nxivm has described itself as a "professional business providing educational tools, coaching and trainings to corporations and people from all walks of life," and describes its philosophy as "a new ethical understanding" that allows "humanity to rise to its noble possibility."

4

14.     Nxivm maintains headquarters at 455 New Karner Road, Albany, New York 12205. Nxivm operates centers all over the Americas including in the United States, Canada, Central America and Mexico. Raniere and many members of Nxivm ("Nxians") live approximately 15 miles outside of Albany, New York, in Halfmoon, New York, near Nxivm's headquarters. The instrument transferring title of the Hale Drive Property to Executive Housing & Properties, Inc. lists 455 New Karner Road, Albany, New York 12205 as Executive Housing & Properties, Inc.'s place of business.

15.     Raniere is referred to as "The Vanguard" by Nxians. Every year in August, Nxians celebrate "Vanguard Week" in honor of Raniere's birthday. Nancy Salzman is referred to as "The Prefect" by Nxians, and her birthday is celebrated in May with the "Festival of Flowers."

16.     Each of the Raniere entities offers expensive courses (many, for example, costing $5,000 for 5 days), promising personal and professional development. Participants are encouraged to keep attending classes and to recruit others into the organization in order to rise within the ranks of Nxivm and to reach certain "goal levels." These levels are marked by different color sashes, which are worn by Nxians, as well as different responsibilities and privileges, including the ability to receive a salary or commissions.

17.     Nxivm maintains features of a multilevel marketing scheme, commonly known as a pyramid scheme, in which members are recruited via a promise of payments or services for enrolling others into the scheme. Raniere formerly ran a multilevel marketing scheme called Consumers Buyline, which was forced to close after a settlement with the New York Attorney General in 1997, approximately one year before ESP was founded.

18.     Based on information obtained during the course of this investigation, since ESP's founding, Raniere has maintained a rotating group of fifteen to twenty women with whom he maintains sexual relationships. These women are not permitted to have sexual relationships with anyone but Raniere or to discuss with others their relationships with Raniere. Some of the Nxivm curriculum includes teachings about the need for men to have multiple sexual partners and the need for women to be monogamous.

II.     DOS

A.     Development and Structure

19.     In or about 2015, Raniere founded a secret society within Nxivm called "DOS" or the "Vow" (collectively "DOS").

20.     DOS operates as a pyramid with levels of "slaves" headed by "masters." Slaves are expected to recruit slaves of their own (thus becoming masters themselves), who in turn owe service not only to their own masters but also to masters above them in the DOS pyramid.

21.     Based on information gathered over the course of this investigation, including Raniere's own admissions and emails between Raniere and other members of DOS, Raniere alone forms the top of the pyramid as the highest master. Other than Raniere, all participants in DOS are women. Raniere's status as head of the pyramid was concealed from all newly recruited slaves, other than those directly under Raniere.

22.     From the time of its inception through in or about Spring 2017, DOS masters recruited slaves mostly from within Nxivm's ranks. When identifying prospective slaves, masters often targeted women who were currently experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement in Nxivm. While avoiding

6

the words "master" and "slave" in the initial recruiting pitch, a master would tell her prospective slave that the prospective slave had an opportunity to join an organization that would change her life. The master then told the prospective slave that, in order to learn more, she had to provide "collateral," which was meant to ensure that the prospective slave would keep what she was about to learn a secret. Collateral consisted of material or information that the prospective slave would not want revealed because it would be ruinous to the prospective slave herself and/or someone close to her.

23.     Collateral provided by prospective slaves included sexually explicit photographs; videos made to look candid in which the prospective slaves told damning stories (true or untrue) about themselves, close friends and/or family members; and letters making damaging accusations (true or untrue) against friends and family members and assigning the rights to certain assets. In many cases, the masters helped the prospective slaves develop ideas for what would be appropriate collateral or instructed the prospective slaves on lies to tell in order to make the collateral even more damaging.

24.     After prospective slaves provided collateral in order to learn more about the organization, the masters informed them that DOS was a women-only organization (Raniere's role as the highest master was not mentioned) and that the goal of DOS was to eradicate weaknesses in its members.

25.     All DOS slaves were ultimately required to provide collateral beyond what had initially been described to them. For example, most DOS slaves were not initially told that they would have to provide collateral every month. In most cases the DOS slaves continued to provide additional collateral beyond what they had initially understood was

expected, in part because they feared that the collateral they had already provided would be released.

26.     DOS slaves provided collateral to their masters in multiple forms including uploading collateral to an online storage account and providing collateral on thumb drives. Lauren Salzman, who is a DOS master, told one of her slaves that the collateral is kept in a safe.

27.     DOS slaves were required to perform "acts of care" for their masters and to pay "tribute" to their masters in various ways. In many cases these acts of care and tribute were akin to acting as personal assistants to the masters – bringing them coffee, buying them groceries, making them lunch, carrying their luggage, cleaning their houses and retrieving lost items for them, among other tasks. The understanding among DOS members was that acts of care provided by a master's slaves, and those slaves' own slaves, should ultimately amount to the master having the work of at least one full time employee.

28.     Slaves were chastised and punished for not performing sufficient acts of care, and slaves believed that if they repeatedly failed at acts of care they risked release of their collateral.

29.     Many DOS slaves were also branded with a cauterizing pen during a process that took 20-30 minutes. The branding "ceremony" involved slaves taking turns holding each other down while the branding was filmed. DOS masters informed the DOS slaves that the video footage of the slaves being branded and naked pictures of the women bearing their brands were further pieces of collateral. One of the branding ceremonies took place in Brooklyn. Jane Doe 1, a DOS slave described further below, was required to attend this branding ceremony.

8

B.    Sex Trafficking Within DOS

30.    Beyond acts of care, DOS slaves were also regularly given assignments to complete by their masters. Some of the masters gave their slaves assignments that either directly or implicitly required them to have sex with Raniere, which they then did. Other assignments appeared designed to groom slaves sexually for Raniere. For example, Raniere is known to sexually prefer women who are exceptionally thin, and a number of the slaves' assignments required them to adhere to extremely low-calorie diets and to document every food they ate. Other women were assigned to periods of celibacy, during which they were not allowed to have sex with anyone or masturbate.

31.    Based on information obtained over the course of the investigation, DOS victims who received the assignment to have sex with Raniere believed they had to complete the assignment or risk release of their collateral.

32.    The DOS masters, who directed their slaves to have sex with Raniere profited from the resulting sex acts. Those DOS masters received a financial benefit in the form of continued status and participation in DOS, i.e., the masters continued to receive acts of care and the work of the equivalent of a full-time employee. In addition, by requiring DOS slaves to have sex with Raniere, DOS masters also received benefits from Raniere in the form of increased status and financial opportunities within Nxivm more broadly. Raniere also often discussed or promised career opportunities to the DOS slaves who had sex with him and the DOS slaves with whom he expressed an interest in having sex. As one example, discussed further below, once Jane Doe 1 began having sex with Raniere, he provided her with money and offered her a job, but as soon as she defected from DOS and stopped having sex with him, Raniere told her she had to pay the money back.

9

C.    Defections and Aftermath

33.    In or about May 2017, a DOS slave (who was also a high-ranking member of Nxivm) defected in a public way. At that time, Nxians began learning about the existence of DOS and there was some defection of Nxians, including a member of the Executive Board and additional DOS members.

34.    In or about October 2017, *The New York Times* published an article revealing the existence of DOS. Several weeks after that article was published and after the FBI began interviewing witnesses, Raniere flew to Mexico with an heiress (the "Heiress"), who is a member of Nxivm's Executive Board and is a known financial backer of Raniere and Nxivm. Prior to this trip, Raniere had not flown out of the country since 2015, when he visited the Heiress's private island in Fiji. In or about March 2018, Raniere was deported from Mexico, where Nxivm maintains at least two centers, to face criminal charges in the Eastern District of New York.

35.    Since defecting, several DOS victims have received "cease and desist" letters from a Mexican attorney. Emails exchanged between Raniere and the Heiress, obtained pursuant to a search warrant executed on Raniere's email account, reveal that the Heiress and Raniere orchestrated the sending of those letters. Additionally, the Heiress has made multiple attempts to have criminal charges brought against a former DOS slave who has discussed her experience in the media.

36.    In or about December 2017, a letter purporting to be from Raniere was posted on Nxivm's website. In the letter, Raniere stated that neither he nor Nxivm are affiliated with DOS. Nxivm has continued to enroll students in courses since Raniere left for Mexico, though enrollment numbers have been down since the media reports of DOS.

III.    Use of the Defendants *in Rem* to Commit Sex Trafficking

37.    Jane Doe 1 is an actress in her early thirties who began taking Nxivm classes in or about 2015, including with a woman named Allison Mack, who is understood from numerous sources to be Raniere's direct slave. In or about February 2016, Mack invited Jane Doe 1 to join a "women's mentorship group," but asked that Mack first provide collateral. At Mack's direction, Jane Doe 1 wrote letters detailing false and highly damaging accusations against her family members. Once Jane Doe 1 had provided this collateral, Mack told her about DOS, referring to it as "The Vow."

38.    Jane Doe 1 agreed to become Mack's slave, provided more collateral (eventually including her credit card numbers with letters granting Mack permission to use the numbers to make charges) and began receiving assignments. Throughout her time in DOS, Jane Doe 1 was living in Brooklyn, New York. Mack ordered Jane Doe 1 to travel to Halfmoon nearly every week from Brooklyn. When Jane Doe 1 was in Halfmoon, she stayed with Mack at Mack's residence, the Grenadier Court Property. Jane Doe 1 received multiple communications via cell phone, text and email from Mack while Jane Doe 1 was located in Brooklyn.

39.    Mack told Jane Doe 1 that Jane Doe 1 had to be celibate for six months. Eventually, Jane Doe 1 began receiving assignments that involved contact with Raniere. At first Mack tasked Jane Doe 1 with getting Raniere to send Jane Doe 1 an email, which she eventually succeeded at doing. One night when Jane Doe 1 was staying with Mack at the Grenadier Court Property, Mack received a text message from Raniere, woke Jane Doe 1 in the middle of the night, and told her that Raniere was there to go for a walk with her. Mack told Jane Doe 1 that Jane Doe 1 was assigned to tell Raniere that Jane Doe 1 would do anything

11

Raniere asked her to do. Jane Doe 1 did as she was ordered and Raniere asked her what the worst thing he could order her to do was. Jane Doe 1 told Raniere that she had initially thought it would be something sexual, but that the worst thing would be if he asked her to kill herself or someone else. At the end of the walk, Raniere told Jane Doe 1 that he did not believe she really meant she would do anything he asked.

40. The next night Mack again received a text message from Raniere, woke Jane Doe 1 in the middle of the night and assigned her to meet Raniere and tell him she would do anything he asked her to do. Jane Doe 1 did as she was assigned, and Raniere led her to a house across the street. Raniere directed her to remove all her clothes and made comments about her naked body. Raniere then blindfolded Jane Doe 1, led her into a car and drove her around in a manner that made Jane Doe 1 believe Raniere was trying to prevent her from knowing where they were going. Raniere led Jane Doe 1, still blindfolded, through some trees, into what she believed was a shack, and tied her to a table. Another person in the room, who Jane Doe 1 did not previously know was present, began performing oral sex on Jane Doe 1 as Raniere circled the table making comments. Jane Doe 1 did not want to participate in this sexual activity, but believed it was part of her commitment to DOS and that if she broke her commitment to DOS her collateral could be released.

41. Jane Doe 1 was never put on a diet by Mack, but Jane Doe 1 was 5'5" tall and weighed only 100 pounds before joining DOS, and she then lost some additional weight as a member of DOS due to stress and lack of sleep.

42. In the following months, Raniere had repeated sexual contact with Jane Doe 1, including oral sex and sexual intercourse on a number of occasions. Most often this

sexual activity would take place at the Hale Drive Property, which Raniere called the "Library."

43.     Raniere was very anxious about security at the Hale Drive Property, and multiple witnesses have stated that there are security cameras outside the Hale Drive Property. Raniere also insisted that the shades at the Hale Drive Property be kept drawn, and on one occasion when he believed the shades had been moved by someone, he interrogated Jane Doe 1 about whether she had moved the shades to satisfy himself that no one else had entered the Hale Drive Property without his knowledge. Raniere also instructed Jane Doe 1 to make sure no one saw her enter or leave the Hale Drive Property, and when there was snow on the ground, Raniere instructed Jane Doe 1 to make sure to clear her footprints.

44.     At one point, Jane Doe 1 expressed to Raniere that she was having difficulty affording the frequent trips from Brooklyn to Halfmoon. Raniere was frustrated with her and took a bag with $10,000 in cash from a drawer in the Hale Drive Property and asked her if that would make her happy. Jane Doe 1 began using the cash to pay for her trips from Brooklyn to Halfmoon and back, only taking enough for the ticket each time she visited. On one occasion when she needed money, Raniere gave her $1,000 from the bag.

45.     According to a high-ranking member of Nxivm, Raniere also keeps boxes of personal notes at the Hale Drive Property. Raniere is known to be a prolific writer who often documents his interactions with people, including sexual partners.

46.     Additionally, at least two other DOS slaves had regular sexual encounters with Raniere at the Hale Drive Property.

47.     At some point, Raniere told Jane Doe 1 that he was Mack's master and Jane Doe 1's "grandmaster." Raniere told Jane Doe 1 that he had conceived the concept of

13

DOS. Raniere explained to Jane Doe 1 that he could order her to have sex with him, although he claimed that was not what he was doing. Jane Doe 1 felt, however, that having sex with Raniere was part of her DOS commitment and that if she broke her commitment to DOS, her collateral might be released.

48.     Jane Doe 1 believed that at some point all the other slaves directly under Mack, learned that Raniere was Mack's master and their grandmaster. Throughout Jane Doe 1's time in DOS, Mack regularly required her slaves to pose for nude photographs, either as assignments or collateral. These photographs included on one occasion close-up pictures of their vaginas. Jane Doe 1 later learned that Mack was sending these photographs to Raniere, because Jane Doe 1 observed Mack sending these photographs using Mack's cellphone to someone over a messaging service and then receiving responses which Mack would sometimes relay to her slaves. The responses included that the photographs were not graphic enough or that the slaves were not smiling enough, and that they had to be retaken. On one occasion, Jane Doe 1 saw a text exchange on Mack's phone between Raniere and Mack, in which Mack sent a nude photo she had just taken of all of the slaves on Jane Doe 1's level and Raniere wrote back, "All mine?" with a smiling devil emoticon.

49.     After the May 2017 incident, as described in paragraph 33, because other DOS members had left without having had (to Jane Doe 1's knowledge) their collateral released, Jane Doe 1 began to believe she might also be able to leave without having her collateral released. When she told Mack that she was leaving DOS, Mack and other slaves in Jane Doe 1's line engaged in a two-hour "intervention," during which Jane Doe 1 was berated for leaving. Throughout the conversation, Jane Doe 1 sought assurances about her collateral. Although Mack never directly said her collateral would not be released, she felt assured enough

14

that as long as she did not speak out about DOS (as opposed to just breaking her lifetime commitment), her collateral would not be released. After the intervention, Raniere met Jane Doe 1 and told her she needed to return the money he had previously given her.

## FIRST CLAIM FOR RELIEF

50.     Plaintiff repeats and realleges each and every allegation contained paragraphs 1 through 49 as if fully set forth herein.

51.     The Hale Drive Property constitutes property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 1591 (sex trafficking) and/or conspiracy to commit a violation of 18 U.S.C. § 1591, contrary to 18 U.S.C. § 1594.

52.     By reason of the foregoing, the Hale Drive Property is liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. § 1594(e)(1)(A).

## SECOND CLAIM FOR RELIEF

53.     Plaintiff repeats and realleges each and every allegation contained paragraphs 1 through 49 as if fully set forth herein.

54.     The Grenadier Court Property constitutes property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 1591 (sex trafficking) and/or conspiracy to commit a violation of 18 U.S.C. § 1591, contrary to 18 U.S.C. § 1594.

55.     By reason of the foregoing, the Grenadier Court Property is liable to

condemnation and forfeiture to the United States pursuant to 18 U.S.C. § 1594(e)(1)(A).

Dated: Brooklyn, New York
       May 23, 2018

> RICHARD P. DONOGHUE
> UNITED STATES ATTORNEY
> *Attorney for Plaintiff*
> Eastern District of New York
> 271 Cadman Plaza East
> Brooklyn, New York  11201

By: _____

> Karin Orenstein
> Assistant United States Attorney
> (718) 254-6188

16

## VERIFICATION

Michael Lever hereby declares as follows:

      1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI").

      2.      I have read the verified complaint *in rem* in this action and know the contents thereof.

      3.      The matters contained in the within verified complaint *in rem* are true and accurate to the best of my knowledge, information and belief.

      4.      The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers, review of law enforcement and public records databases, witness interviews and the official files and records of the FBI and other law enforcement agencies.

      I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
      May 22, 2018

 

                      Michael Lever
                      Special Agent, FBI